UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **TRIDENT STEEL CORPORATION,** | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:16-CV-339 |
| | § | |
| **VECTA OIL AND GAS, LTD.,** | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Plaintiff Trident Steel Corporation sued Defendant Vecta Oil and Gas for breaching a contract for the sale of oil well casing. In December 2017, a jury returned a verdict for Trident. (Doc. No. 72.) Trident now moves for entry of judgment, with actual damages, pre- and post-judgment interest, attorney's fees, and expenses. (Doc. No. 73.) Having carefully considered the parties' arguments and the applicable law, the Court **GRANTS** Trident's motion and resolves the issues that remain contested between the parties.

### I. BACKGROUND

In mid-2014, Vecta was preparing to drill a set of exploratory oil wells in the Minnelusa, a formation in Wyoming. It engaged a drilling consultant, non-party Integrated Petroleum Technologies (IPT), to aid its planning. As a part of that effort, Dennis Geiss, an assistant drilling superintendent at IPT, began gathering bids for oil well casing. (Ex. 17 at 3–4.) Geiss solicited bids from Trident, among others. The record shows Geiss corresponding with Ryan Hunt, Trident's salesman, in May 2014. (*Id.*) That initial correspondence also included Amber

1

Hoffmeister, Vecta's Office Manager, and Mathew Goolsby, Vecta's Vice President of Operations, concerning Vecta buying the casing from Trident on credit. (Ex. 17 at 1–3.)

Trident had sold casing to Vecta in July 2012 for a different drilling project. (Ex. 1 at 1.) At that time, Vecta submitted a credit application listing Goolsby as the "Accounts Payable Contact." (*Id.* at 3.) Trident approved the application with a credit limit of $100,000, and Vecta bought some $85,000 of casing without incident. (Doc. No. 48 at 12.)

The credit application contained terms potentially relevant to the present case. The credit applicant, by signing the application, agreed "[t]hat Trident Steel Corporation terms and conditions set forth on its invoices shall govern all sales to the undersigned." (Ex. 1 at 2.) The application also contained two mostly duplicative sets of terms that bear on the present issues of pre-judgment interest, attorney's fees, and expenses. One set stated as follows:

> TRIDENT STEEL CORPORATION'S STANDARD PAYMENT TERMS ARE NET 30 DAYS FROM THE INVOICE DATE, UNLESS OTHERWISE AGREED UPON BETWEEN BOTH PARTIES. INTEREST WILL BE CHARGED ON OVERDUE BALANCES AT THE MAIXMUM [sic] LEGAL RATE. CUSTOMER AGREES TO PAY UPON DEMAND THE FULL AMOUNT OF INDEBTEDNESS, PLUS FINANCE CHARGES AND ATTORNEY'S FEES INCURRED IN CONNECTION WITH THE COLLECTION OF THE ACCOUNT, WHETHER OR NOT SUIT IS FILED.

(*Id.*) The other set, found on a page titled "Terms and Conditions of Sale," said: "Buyer agrees to the price and payment terms as invoiced. Buyer agrees to pay interest on overdue balances at the rate of 1.5% per month. Buyer agrees to pay all costs and expenses (including but not limited to court costs, reasonable attorney's fees, and litigation expenses) incurred by Seller in connection with the enforcement of any provision of this agreement." (*Id.* at 4.)

On September 11, 2014, Trident's Hunt sent IPT's Geiss another bid for the casing that Vecta would use in its Minnelusa project. (Ex. 16.) Geiss promptly responded, "Make it happen buddy!" (*Id.*) At trial, the jury found that this was the moment that Vecta, through the apparent

2

authority of Geiss, formed its contract with Trident. (Doc. No. 72 at 23–24.)

The bid quoted prices for four types of casing in specific quantities, with a total value over $450,000. Neither Hunt's bid, the offer in this contract, nor Geiss's response, the acceptance, made any mention of Vecta's credit, however. The terms section of Hunt's bid read in full as follows: "Terms: **Net 30**. Subject to prior sale, price in effect at the time of order, truck availability and fuel costs. <u>Material is to be invoiced as shipped to Rig-site</u>. Total footage shipped in truckloads to Reynolds Transportation to be stored for Vecta's use. This will be a non-cancellable order and any unshipped material will be invoiced and transferred 12/31/2014." (Ex. 16.)

On November 11, 2014, Trident and Vecta formed a second contract for another, smaller transaction. (Ex. 39.) Hunt sent a bid for just over $20,000 of casing to Jeanell Reis, another IPT employee, who accepted it. The bid contained the same terms as the bid from September. Just as it did with the September transaction, the jury found that the Trident bid and the IPT employee's acceptance formed a binding contract between Trident and Vecta. (Doc. No. 72 at 29–30.)

Trident soon began to invoice Vecta for the casing.[1] On December 23, 2014, it sent an invoice for $119,484.92. (Ex. 13.) On January 8, 2015, it sent one invoice for $20,852.00 and another for $31,323.63.[2] (Ex. 14, 15.) These invoices went unpaid, and the parties were soon negotiating the disposition of the casing. (Ex. 42, 44, 45.) From their correspondence, it is clear that Vecta was no longer sure of its drilling plans and perhaps would not use much or any of the casing. (Ex. 42.) The parties' negotiations were not successful, however, and by January of the

---

[1] The figures used here include freight but exclude tax.

[2] The trial exhibits of these invoices contained the following: "**NOTE: TERMS AND CONDITIONS OF SALE ARE LISTED ON REVERSE SIDE OF THIS INVOICE.**" (Ex. 13, 14, 15.) Curiously, each exhibit was blank on the reverse side. Matt Beckmann, Trident's Vice President, testified that the terms and conditions were the same as on the credit application. That testimony was not rebutted.

following year, Trident was threatening suit. On January 22, 2016, Trident sent Vecta a letter demanding the full contract price and attaching the complaint it would file if payment were not promptly made. (Doc. No. 73-2.) It was not, and this lawsuit followed.

## II.  DISCUSSION

Through their post-trial briefing, the parties reached agreement on the actual damages that Trident incurred and on the post-judgment interest to which it is entitled.[3] (Doc. No. 75 at 1–2.) The parties disagree on the issues of pre-judgment interest, attorney's fees, and certain non-taxable expenses. Each contested issue depends on whether Vecta's credit application, which Trident approved in 2012, supplies terms for the parties' two contracts in 2014. If not, the default rules of state law govern. The Court takes this general issue first, before turning to the others.

### a.  The Credit Application and Contract Formation

The jury was not asked to decide whether the 2012 credit application was a part of the contract,[4] and so it remains for the Court to decide. At the hearing on the present motion, Trident argued that this Court previously determined that the credit application's terms governed the parties' contracts. In Trident's view, the law-of-the-case doctrine therefore dictates the outcome here. Early in the litigation, Vecta had moved to transfer the case to Colorado. (Doc. No. 26.) Opposing the transfer, Trident pointed to the forum-selection clause in the "Terms and

---

[3] The parties agree that actual damages are $262,753.30 and that post-judgment interest should be calculated at the rate published by the Southern District of Texas for the week that judgment is entered.

[4] The jury was presented with Exhibits 16 and 39, the bids from Trident's salesman to IPT's employees, and asked whether Vecta agreed to the terms that they contained. (Doc. No. 72 at 23–24, 29–30.) The jury was instructed that "[i]n deciding whether the parties reached an agreement, [it] may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing." (*Id.*) No question put to the jury or answer given by it, however, directly addressed whether the credit application was part of the contract.

Conditions" page of the credit application, which identified the Southern District of Texas as the forum. (Doc. No. 28 at 2; Ex. 1 at 4.) In its reply, Vecta chose not to contest the applicability of the forum-selection clause but rather to argue that it should be disregarded. (Doc. No. 30 at 2.) Because this Court applied the credit application's forum-selection clause in ruling for Trident (Doc. No. 37 at 6), Trident contends that it is the law of the case that the credit application is part of the contract.

The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). "The law-of-the-case doctrine does not, however, set a trial court's prior rulings in stone, especially if revisiting those rulings will prevent error." *United States v. Palmer*, 122 F.3d 215, 220 (5th Cir. 1997). "[I]n civil cases a district court is not precluded by the law-of-the-case doctrine from reconsidering previous rulings on interlocutory orders … as those rulings are not immutable and lack res judicata effect." *Id.* A ruling on a motion to transfer is an interlocutory order, and so the doctrine does not tie the Court's hands.

At the hearing on the present motion, Trident also argued that Vecta had waived any challenge to the inclusion of the credit application in the contract. Indeed, Vecta's response and sur-reply do not expressly address the issue. As Vecta notes, however, its response to Trident's motion did point to the parties' pre-trial stipulation that "[t]he Court should determine the entitlement to, and amount of, any legal fees, expenses, costs, and pre-judgment interest requested by either party." (Doc. No. 74 at 6; Doc. No. 41 at 1.) In their briefing of these issues, neither party held to a consistent position on the source of applicable law, referring to state default rules at some points but to the credit application at others. In order to resolve this

5

confusion and correctly determine the issues that, by stipulation, were left for it to decide, the Court must revisit the credit application's inclusion in the contract.

Under Texas principles of contract interpretation, a court "must ascertain and give effect to the parties' intentions," and it generally looks to "the document" that expresses them. *Frost Nat'l Bank v. L&F Distributors, Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005). It should "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served and [should] avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Id.* at 312 (quotations omitted).

Sometimes the parties' intentions are not expressed in only one document. Under Texas law, "a contract can consist of more than one document." *In re Laibe Corp.*, 307 S.W.3d 314, 317 (Tex. 2010). It is "well-established law that instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other, and that a court may determine, as a matter of law, that multiple documents comprise a written contract." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000). The Texas Supreme Court has "cautioned, however, that this rule is simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily." *DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 102 (Tex. 1999).

The chief argument against considering the credit application a part of the contract is that it concerned a different transaction two years earlier than the contracts at issue here. When Texas courts have decided that multiple documents together comprised a contract, the circumstances typically have been different. *See, e.g.*, *In re Laibe Corp.*, 307 S.W.3d at 317 (reading an invoice and a subsequent equipment purchase contract together because they "pertained to the same

6

transaction"); *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 840 (holding that two ordinances of the Fort Worth city council, as well as "contemporaneous, related documents," comprised the city's contract with the local school district, because they were made at the same time and concerned a common subject). The bids found to comprise Trident's offers in the present case, by contrast, came two years after the credit application and made no mention of it.

Another argument against inclusion of the credit application is that Trident seemingly disregarded the $100,000 credit limit in approving a sale that exceeded $450,000. If Vecta's ability to purchase casing on credit really were limited to $100,000, Trident would not have approved the sale. The terms of the credit application therefore must not have been in force.

Despite these arguments, the Court concludes that the 2012 credit application was a part of the contracts that the parties formed in September and November 2014. This answer to the question is more consistent with the jury's finding of two valid contracts than the alternative would be. In the Court's view, it is highly unlikely that Trident would agree to such a substantial transaction, made in such an informal manner ("Make it happen buddy!"), were a credit arrangement not already in place. Indeed, the parties' correspondence in May 2014 that preceded contract formation made explicit reference to their preexisting credit arrangement. The Court takes this view despite the $100,000 limit in the credit application. Vecta repeatedly urged the significance of that figure at trial, arguing that it meant a contract could not have been validly formed, but the jurors were not apparently persuaded. The Court honors their decision here. Vecta's choice not to contest the credit application's force at the motion to transfer stage, while not dispositive of the issue, also buttresses the conclusion that the Court now reaches.

As noted above, the Texas Supreme Court has said that multiple documents can be read together as the expression of the parties' intent, even if they do not expressly refer to each other.

7

The Court elects to do so here and holds that the terms of the 2012 credit application govern the parties' 2014 contracts.

### b. Pre-Judgment Interest

The amount of pre-judgment interest depends on the date when interest began to accrue and the rate at which it accrued. Under the terms of the credit application, "Buyer agrees to pay interest on overdue balances at the rate of 1.5% per month."[5] (Ex. 1 at 4.) The application also specifies that Trident's terms are "net 30 days from the invoice date." (*Id.* at 2.)

In their briefing, the parties have taken varying positions on the correct law for determining the accrual date and interest rate of pre-judgment interest. In its motion, Trident looked to the credit application for both. (Doc. No. 73 at 3.) In its response, Vecta contended that state law determines the accrual date, but it applied the same interest rate that Trident did. (Doc. No. 74 at 7.) Trident then filed a reply adopting Vecta's view that state law determines the accrual date of pre-judgment interest, but like Vecta, it continues to look to the credit application for the pre-judgment interest rate. (Doc. No. 75 at 1–2.)

Under Texas law, pre-judgment interest generally is based either on "general principles of equity" or on "an enabling statute." *Johnson & Higgins of Texas, Inc. v. Kenneco Energy*, 962 S.W.2d 507, 528 (Tex. 1998). The purpose of pre-judgment interest is "compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Id.* (quoting *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 552 (Tex. 1985)). It also serves the purposes of "(1)

---

[5] Elsewhere, the credit application calls for interest on overdue balances simply to accrue at the maximum legal rate. "It is a maxim of interpretation that when two provisions of a contract conflict, the specific trumps the general." *Millgard Corp. v. McKee/Mays*, 49 F.3d 1070, 1073 (5th Cir. 1995). Accordingly, the term specifying an interest rate trumps the term referring generally to state law.

encouraging settlements and (2) expediting both settlements and trials by removing incentives for defendants to delay without creating such incentives for plaintiffs." *Id.* (citing *Cavnar*, 696 S.W.2d at 554–55).

Rather than rely on state default rules, the parties here appear to have agreed on the terms of pre-judgment interest.[6] The credit application's provision of 1.5% interest per month on overdue balances, starting thirty days after the invoice date, performs the same function as statutory or equitable pre-judgment interest. The provision does not, however, resolve all issues. It speaks only of invoiced balances, but Trident did not invoice Vecta for the entirety of the casing at issue here. In addition, it does not specify whether interest should be simple or compound.

Concerning sums for which Trident did not invoice Vecta, state law supplies the default rule for determining the accrual date. "[U]nder the common law, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed." *Johnson & Higgins*, 962 S.W.2d at 531. Suit was filed on February 8, 2016. The question, then, is whether Vecta received "written notice of a claim" for the uninvoiced sums at least 180 days before Trident filed suit.

A claim is "a demand for compensation or an assertion of a right to be paid." *Johnson & Higgins*, 962 S.W.2d at 531. "A defendant has notice of a claim for purposes of prejudgment

---

[6] At the hearing, there was some question whether state law permits this. Contract law generally permits the parties to vary default rules by agreement, and the Court sees no reason that pre-judgment interest is different. *See* RESTATEMENT (SECOND) OF CONTRACTS § 5 cmt. b (Am. Law Inst. 1981) ("Much contract law consists of rules which may be varied by agreement of the parties."); rep. note b ("The choice of terms is primarily a power of the parties to a contract.").

To support the contrary view, the parties cite Section 304.104 of the Texas Finance Code, which provides a rule for determining the pre-judgment interest accrual date and which does not expressly allow the parties to vary the rule by agreement. (Doc. No. 74 at 7 n.11; Doc. No. 75 at 1.) But that provision applies only to wrongful death, personal injury, or property damage cases. TEX. FIN. CODE § 304.101. It does not apply to breach of contract actions.

9

interest only if the plaintiff's written notice communicates that the plaintiff is claiming a right to compensation and provides enough information that the defendant could plausibly settle the claim without incurring interest." *Wheelbarger v. Landing Council of Co-Owners*, 471 S.W.3d 875, 892 (Tex. App.—Houston [1st Dist.] 2015). The notice must be "certain and unconditional," and it should urge its recipient "to accept an accrued, existing liability." *Toshiba Machine Co., America v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 786 (Tex. App.—Fort Worth 2005). Where it is equivocal, urging its recipient only "to avoid a contingent, future liability," it is inadequate. *Id.*

In its reply, Trident argues that a letter from its Vice President, Matt Beckmann, to Vecta on March 31, 2015 is written notice of its claim. (Doc. No. 75 at 3–4.) The letter recounts invoices sent up to that point and, on the assumption that Vecta will drill two more wells, proposes to hold the remaining casing for Vecta. (Ex. 42.) It then warns Vecta that "if no material is consumed in April, Trident will transfer and invoice all [remaining casing] in order to bring the matter to a conclusion." (*Id.*) Whether or not Vecta ultimately used the casing, Trident's letter makes clear that the order for casing is "non-cancelable" and "non-returnable." The alternative paths laid out in the letter concern only the timing of future invoices, not the sum that Trident expects to be paid. Trident is unequivocal that it will not simply accept a return of the casing. The Court holds that this letter is sufficiently certain and unconditional to constitute the written notice of Trident's claim that Texas law requires. Accordingly, pre-judgment interest accrues from 30 days after the invoice date for each sum contained in an invoice. Otherwise, following state law, it accrues from 180 days after March 31, 2015.

As for whether the interest rate is simple or compound, the credit application does not make it clear. In its response, Vecta contends that pre-judgment interest should not compound.

(Doc. No. 74 at 7.) In its reply, Trident takes the same view. (Doc. No. 75 at 4.) That approach coheres with Texas law, when the Texas statutes address the issue. *See* TEX. FIN. CODE § 304.104 (providing that pre-judgment interest is "computed as simple interest and does not compound" in wrongful death, personal injury, and property damage cases). The same is true of cases applying Texas common law in circumstances not governed by statute. *See, e.g.*, *Mid-Continent Casualty Co. v. Petroleum Solutions, Inc.*, 248 F. Supp. 3d 837, 846 (S.D. Tex. 2017); *Fairmont Specialty Ins. Co. v. Apodaca*, 234 F. Supp. 3d 843, 855 (S.D. Tex. 2017). Accordingly, the Court follows the consensus in favor of simple interest.

To summarize, the Court's approach is to apply the terms of the credit application, under which interest accrues at a simple rate of 1.5% per month on overdue balances from 30 days after their invoice date. For sums never invoiced, state law dictates that interest accrues from 180 days after written notice of claim is given, which in this instance was March 31, 2015. Accordingly, there are three distinct points at which interest began to accrue: January 23, 2015 (30 days after the first invoice); February 8 (30 days after the second and third invoices); and September 27, 2015 (180 days after the March 31 written notice of claim). To complicate matters, there are also two points at which pre-judgment interest *stopped* accruing. Subject to an agreed order, Trident was permitted to sell the casing during the litigation if the opportunity arose. (Doc. No. 24.) It sold some on October 4, 2016 for $66,725.62.[7] (Doc. No. 25.) It sold more on September 2, 2017 for $79,715.60. (Doc. No. 65.) On those dates, pre-judgment interest should stop accruing on those sums. Based on these inputs,[8] the resulting amount of pre-judgment interest to which

---

[7] This figure is the sum of the sale price and the delivery charge. Vecta asserts that the delivery charge should be counted here. (Doc. No. 74 at 5.) Trident appears to concede the point. (Doc. No. 75 at 1.)

[8] The Court models its approach on a recent decision in the Southern District of Texas. *See Mid-Continent Cas. Co.*, 248 F. Supp. 3d at 846 (Atlas, J.). The Court first marked out the days

11

Trident is entitled is $173,257.93.

### c. Attorney's Fees and Expenses

Trident asserts two bases for attorney's fees. First, in its motion, it cites the following term in the 2012 credit application: "Buyer agrees to pay all costs and expenses (including but not limited to court costs, reasonable attorney's fees, and litigation expenses) incurred by Seller in connection with the enforcement of any provision of this agreement." (Doc. No. 73 at 6; Ex. 1 at 4.) Second, in its reply, it cites Section 38.001 of the Texas Civil Practice & Remedies Code, which entitles prevailing parties in breach of contract actions to "reasonable attorney's fees." (Doc. No. 75 at 5.) Trident supports its request with an affidavit from lead counsel Matt Vianello (Doc. No. 73-4), which it supplements in its reply (Doc. No. 75-1). It also supplies the full set of billing invoices produced by Trident's counsel. (*Id.*)

In its response, Vecta argued that Vianello's affidavit failed to establish the billing invoices were business records for the purposes of the hearsay rule and that it was deficient in other respects. (Doc. No. 74 at 13.) Vianello's supplemental affidavit resolves those issues. (Doc. No. 75-1.) In a sur-reply, Vecta argues that Trident waived its entitlement to attorney's fees based on the Civil Practice & Remedies Code because it did not mention the statute in its motion, only in its reply. (Doc. No. 76 at 6–7.) Because the Court holds that the credit application's terms govern the parties' contracts, it does not need to reach the question of waiver. The credit

---

between each significant date (accrual dates, sale dates, and the day before entry of judgment) into periods. For each period, it determined the sum subject to pre-judgment interest. It then found a daily interest rate by multiplying the period's sum by 18% and then dividing by 365. It then multiplied the daily rate for the period by the number of days that the period lasted. This yielded, for instance, $942.76 in pre-judgment interest for the 16 days after the first invoiced sum accrued but before the second and third invoiced sums accrued.

In determining the sums subject to pre-judgment interest in each period, the Court looked to the figures in Vecta's response (Doc. No. 74 at 8–10), with which Trident agreed in its reply (Doc. No. 75 at 1.)

application suffices as a basis for awarding fees.

Trident's billing records are detailed and specific. Vecta has not produced any evidence to contradict Trident's records. Instead, Vecta has focused its arguments on matters not directly related to the sufficiency of Trident's evidence. Because those arguments fail, Trident's billing records stand unrebutted. Based on that unrebutted evidence, Trident seeks $77,366.50 in attorney's fees for 349.45 hours of work by Vianello, 65.25 hours by co-counsel Allen Press, and 8.2 hours by two other lawyers and a paralegal. The Supreme Court of Texas has identified eight factors relevant to the reasonableness of attorney's fee requests:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
>
> (2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>
> (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Fluorine on Call, Ltd. v. Fluorogas, Ltd.*, 380 F.3d 849, 867 (5th Cir. 2004) (quoting *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 818 (Tex. 1997)). None of the factors here counsels a reduction of the fee award. As Trident notes with respect to the first factor, this case entailed a certain measure of complexity. (Doc. No. 75 at 7.) As to the fourth, Trident achieved a full victory at trial, obtaining all the damages it sought. Trident's counsel quotes relatively low hourly rates, so the third and seventh factors support the award. Trident's counsel asserts that it has represented Trident for several years before this case, so the sixth factor supports the award. (Doc. No. 75-1 at 2.) Trident's counsel has evidently been working on

a fixed-fee basis, so the eighth factor does not direct a reduction. No evidence in the record bears on the second or fifth factors. Because the eight factors support Trident's requested fee award, the Court awards the sum of $77,366.50.

Trident also requests an award of $9,521.97 in "non-taxable" expenses. (Doc. No. 75 at 8–9.) These expenses seem mostly to be flights, hotels, and other costs of travel incurred during the litigation. As noted above, the 2012 credit application obligated Vecta "to pay all costs and expenses," including "litigation expenses," that Trident might incur "in connection with the enforcement of any provision of this agreement." (Ex. 1 at 4.) Vecta's response mustered the same objection to these expenses as to the attorney's fee request. Its sur-reply added no other challenge to Trident's request for expenses. Vecta's arguments having failed, Trident is entitled to the expenses that it requests. The Court awards $9,521.67 in expenses.

### III. CONCLUSION

The lawyers for both parties have represented their clients admirably, and their efforts have been an aid to this Court's deliberations, for which it is grateful. The process of litigation nevertheless cannot always harmonize conflicting contentions, and it has not been able to do so here. Accordingly, the Court **GRANTS** Plaintiff Trident Steel Corporation's motion. It will enter judgment in a separate document.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on the 14th day of February, 2018.

_____
HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE